## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| SOUTHLAND ROYALTY COMPANY LLC, | ) | Case No. 20-10158 (___) |
|  | ) |  |
| Debtor.[1] | ) |  |
|  | ) |  |

## DECLARATION OF FRANK A. POMETTI IN SUPPORT OF VOLUNTARY PETITION, FIRST DAY MOTIONS AND APPLICATIONS

I, Frank A. Pometti, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of Southland Royalty Company LLC ("**Southland**"), the debtor and debtor in possession in the above-captioned case (the "**Debtor**") and a managing director of AlixPartners, LLP ("**AlixPartners**").  I have more than 20 years of financial and operational experience, spanning a wide range of industries, including in oil & gas and onshore exploration and production.  I specialize in assisting distressed and underperforming companies in all areas of operational and financial restructuring, and have advised debtors, creditors, investors, and court-appointed officers in multiple chapter 11 and out-of-court matters.  I have a bachelor's degree from The United States Military Academy at West Point and a master's degree in business administration from the Columbia School of Business.

2.      I have overseen the Debtor's preparations for chapter 11 since November 27, 2019, when the company engaged AlixPartners as restructuring advisor and financial advisor. On January 22, 2020, the Debtor engaged AP Services, LLC, an affiliate of AlixPartners, to provide contract employees to the Debtor to assist it in its restructuring, and I became the Debtor's CRO at that time.

---

[1] The last four digits of the Debtor's United States federal tax identification number are 8522.  The Debtor's mailing address is 400 West 7th Street, Fort Worth, Texas 76102.

3.      I submit this declaration ("*Declaration*") in support of the Debtor's petition and motions requesting various types of "first day" relief (collectively, the "*First Day Motions*")[2] necessary to maximize the value of the Debtor's estate during this chapter 11 case.  As CRO, I am familiar with the Debtor's operations, day-to-day business affairs and books and records.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my review of the relevant documents and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, as well as the input of the Debtor's management services provider and advisors.  If I were called upon to testify, I would testify competently to the facts set forth herein.  I am authorized by the Debtor to submit this Declaration.

## Preliminary Statement

5.      The Debtor is an upstream energy company focused on the acquisition, development and exploitation of oil, natural gas and natural gas liquid ("*NGL*") reserves in North America.  The Debtor owns a unique land position comprised of leasehold and mineral interests in approximately 745,000 net working interest acres across both the Wamsutter field ("*Wamsutter*") of the Greater Green River Basin in southwestern Wyoming and the San Juan Basin ("*San Juan*") in southwestern Colorado and northwestern New Mexico, including approximately 150,000 net working interest mineral acres in the Wamsutter field.

6.      As described more fully below, the sustained downturn in the oil and gas sector has created an extremely challenging environment for the Debtor's business, depressing revenues generated by production activities, while at the same time reducing the value of proven reserves. As a result of these trends, the borrowing base on the Debtor's senior secured revolving credit

---

[2]On January 27, 2020 (the "*Petition Date*"), the Debtor filed with the Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "*Bankruptcy Code*").

facility, dated as of March 31, 2015, by and among Southland, Citibank, N.A., as administrative agent (the "***Agent***"), and the lenders and other parties thereto from time to time (the "***Lenders***") (as amended, the "***Credit Facility***"), was re-determined and reduced on December 23, 2019, causing an accelerated repayment schedule.

7.      Some of the very measures taken to mitigate cash depletion contributed to the resulting liquidity crunch.  To conserve cash in the short term, the Debtor limited its drilling and capital expenditures.  In the long term, however, these measures deprive the Debtor of additional revenue and result in sizeable payments under certain gathering agreements, which require the Debtor to pay for transportation of hydrocarbons at specified minimum volume commitment levels ("***MVC***").  These MVC payments are due regardless of whether the Debtor actually uses these midstream services.  Under these contracts, the Debtor retains sizeable fixed costs even when it is deprived of the revenues associated with higher volumes of production.

8.      Resolving the Debtor's liquidity and returning to profitability requires a right-sizing of its capital structure and fixed costs of production relative to its revenue-generating capacity in the current market.  The Debtor filed this case to facilitate a restructuring, either through a sale of its business free and clear of liabilities to a purchaser who can give it a fresh start, or, if an attractive sale is not attainable, by de-leveraging its balance sheet through a chapter 11 plan.

9.      Part I of this Declaration provides a brief overview of the Debtor's business.  Part II provides a summary of the Debtor's organizational and capital structure.  Part III discusses the market environment, the Debtor's business decline, and otherwise describes the events and circumstances leading up to the bankruptcy.  Part IV addresses the Debtor's strategy to maximize

the value through the prosecution of this chapter 11 case.  Finally, Part V affirms the facts that support the relief requested in the First Day Motions.

**I.      The Debtor's Business**

        10.      The Debtor is a privately-held independent exploration and production company engaged in the acquisition and development of hydrocarbons.  Headquartered in Fort Worth, it conducts its business across four states, with the majority of operations in Wyoming and New Mexico.  The Debtor was formed principally to produce and extract hydrocarbons in the Wamsutter field of the Green River Basin and in the San Juan Basin.  The Debtor's operations are situated as follows:



11.     The Debtor owns interests in both leasehold and fee mineral estates.  Specifically, as of January 20, 2020, the Debtor owns leasehold interests in approximately 595,000 net acres between Wamsutter and San Juan, and mineral interests in approximately 150,000 net working interest mineral acres in the Wamsutter.  In addition to retained working interests,[3] the Debtor also owns non-cost bearing royalty interests on the mineral acreage it owns and has leased to other parties.  This retained royalty interest entitles the Debtor to, on average, monthly payments of approximately 15% of the gross revenue generated from production on the acreage.[4]

12.     With respect to its mineral interests, the Debtor is typically the sole operator and has retained a 100% working interest in a portion of such mineral acreage.  It has leased to other operators the remaining portion of mineral acreage.  On mineral acreage that the Debtor has retained as the operator, it bears 100% of the costs and retains 100% of the revenue interest on such acreage.  The Debtor has also typically retained a working interest in mineral acres that it has leased to other operators.

13.     Finally, the Debtor also owns surface rights on approximately 87,000 gross acres in the Wamsutter field, creating significant operational efficiencies.  Surface rights remove operational impediments caused by surface uses of the land where drilling occurs and enhance capital efficiencies via optimal well spacing and lower cost drilling programs that deliver

---

[3] A holder of working interests is responsible for its *pro rata* share of capital expenditures and lease operating expenses based on its percentage working interest and is entitled to revenues derived from such interest based on the holder's net revenue interest.  A leaseholder's net revenue interest in a property generally equals such holder's working interest in such property less any royalties, production payments and any other interests burdening the property.

[4] For example, on sections of the approximately 246,000 gross acres in the Wamsutter leased to others, the Debtor holds a 15% royalty interest as well as a 25% working interest (in the remaining 85% of the leasehold, or 21.25% of the total), with BP holding the other 75% working interest.  As a result, net revenue interest in wells developed on such a leased section would be 36.25% (15% royalty and 21.25% working interest) if participating in the development of such wells and bearing a share of the cost of such wells.  If not participating in development of a well, the Debtor is still entitled to payment on its 15% royalty interest.

superior economic returns.  The Debtor is also not forced to pay surface owner agreement fees to third parties for development and transportation uses associated with such acreage.

14.     As of January 1, 2020, the Debtor had approximately 1,556 billion cubic feet equivalent, or Bcfe, of total proved reserves (approximately 61% natural gas, 24% NGLs and 15% oil) consisting of approximately 44% proved developed producing reserves and 56% proved undeveloped reserves.  For the three months ended December 31, 2019, the Debtor's production totaled approximately 309 million cubic feet equivalent per day, or MMcfepd, (approximately 69% gas, 20% NGLs and 11% oil).[5]

## II.     The Debtor's Organizational and Capital Structure

### A.     *Organizational Structure and Governance*

15.     The Debtor was formed as a Delaware limited liability company in February 2015 as a joint venture among EnCap Energy Capital Fund IX, L.P., EnCap Energy Capital Fund X, L.P. (together, the "***EnCap Entities***") and MorningStar Partners, L.P. ("***MorningStar***"). Southland is indirectly owned by the EnCap Entities (80%) and MorningStar (20%) through Southland Holdings, LLC and Southland Royalty, L.P. (the Debtor's sole member).

---

[5]Based on Debtor's internal reserve report dated January 1, 2020, and forward strip pricing as of January 21, 2020. Gas equivalent statistics quoted on oil to gas with energy equivalence ratio of six to one.

16.     The Debtor's current organizational structure is as follows:



17.     The Debtor has no employees and outsources all functions of asset management, pursuant to that certain Management Services Agreement, dated as of February 9, 2015, by and between Southland and MorningStar (as amended from time to time, the "*MSA*").  Other than the Debtor's direct engagement of AP Services, LLC for the CRO and CAO services, all employees and executives necessary for the operations of the Debtor are provided by or contracted through MorningStar.  In an effort to conserve liquidity, in December 2019 the Debtor reduced the amount payable under the MSA from approximately $4 million per month to approximately $2.1 million per month, subject to the terms and formula in the MSA.

18.     Prior to January 15, 2020, the Debtor was governed entirely by its sole member, Southland Royalty L.P., which in turn was indirectly governed by the board of managers (the

"***Board***") at Southland Holdings, LLC.[6]  The Board is comprised of ten representatives; five are appointed by the EnCap Entities and five are appointed by MorningStar.

19.     In November of 2019, the Debtor created a committee comprised of two EnCap employees, Mark A. Welsh IV and Stephen Meek, to address matters pertaining to the Debtor's potential restructuring (the "***Restructuring Committee***"), and the Debtor engaged restructuring advisors, including Shearman & Sterling LLP, PJT Partners LP ("***PJT Partners***"), and AlixPartners.  The Restructuring Committee also began a process to identify and appoint an independent member of such committee.  On January 15, 2020, the Debtor entered into the Second Amended and Restated Limited Liability Company Agreement (the "***LLC Agreement***") and appointed Steven J. Pully to serve as an independent member of the Restructuring Committee.  Mr. Pully lacks any material relationship with the EnCap Entities, MorningStar, or any of their respective controlled subsidiaries (collectively, the "***Equity Holders***"), either directly or indirectly as a partner, investor, stockholder or officer of an organization that has a relationship with the Debtor or the Equity Holders.  The Restructuring Committee acts at the direction of the majority of its members, except in the case of certain interested party transactions—including any with the EnCap Entities or Morningstar—in which case Mr. Pully alone exercises decision making authority.

20.     On January 22, 2020, the Restructuring Committee approved the retention of AP Services, LLC as interim management services provider, including services of a Chief Restructuring Officer and Chief Administrative Officer.  On January 22, 2020, I was appointed as the CRO and David Rawden was appointed as the Chief Administrative Officer.  The Debtor

---

[6]For the avoidance of doubt, the only chapter 11 debtor in this case is Southland Royalty Company LLC.

intends to seek to have this interim management arrangement approved on a post-petition basis by the Bankruptcy Court.

### B.   *Capital Structure*

21.     The Credit Facility is the Debtor's only funded debt, and, as of the Petition Date, approximately $540 million of indebtedness is outstanding thereunder.  It is a reserve-based revolving credit facility in the original amount of up to $1 billion, subject to a borrowing base. The Credit Facility indebtedness matures on November 30, 2023, and bears non-default interest at LIBOR plus an applicable margin ranging from 1.75% to 2.75%.  The Credit Facility requires that it be secured by liens on at least 95% of the total value of the Debtor's proved reserves and by first priority, perfected liens and security interests on substantially all other assets.

22.     The amount available under the Credit Facility is limited by a borrowing base, which is re-determined semiannually in April and October.  The amount of the borrowing base depends on the volumes of proved oil and natural gas reserves, pricing and estimated cash flows from these reserves, as well as other factors evaluated by the Agent.  In December 2019, the Debtor had fully borrowed $540 million under the Credit Facility, however, the borrowing base was reduced to $400 million.  In accordance with the terms of the Credit Facility, the Debtor elected to repay the deficiency over a period of approximately six months.  The first such installment, in the amount of approximately $23 million, was due January 22, 2020.  The Debtor did not make this payment.  Pursuant to agreements described below, the Agent and Lenders agreed to forbear from defaults arising as a result of this missed payment.

## III.   Events Leading Up to the Chapter 11 Filing

### A.   *Market Pressures*

23.     Like other E&P companies, the Debtor has suffered from the industry's general and sustained decline over the past several years.  For example, in the first nine months of 2019,

I understand that 33 E&P companies have filed for chapter 11 protection. This represents a significant increase compared to the 22 E&P companies that filed for chapter 11 during the first 9 months of 2018, or the 16 E&P companies that filed in the first 9 months in each of 2016 and 2017.

24. At its core, the distress in the industry is a function of commodity prices and the decades-long disruption caused by hydraulic fracturing and horizontal drilling. And while it is commonly understood that oil and gas prices have remained relatively low in comparison to prices before 2015, less appreciated is the recent decline in gas pricing. For example, as the following chart[7] shows, over the past year, gas and oil prices have diverged materially:



---

[7] Figures based on pricing data per Capital IQ and OPIS provided by the Debtor's financial advisors.

25.    As illustrated above, while WTI oil prices are up 5% over the past year, Henry Hub gas prices have declined by nearly 40%.  As the following chart[8] shows, 2020 natural gas futures-strip prices—the projected or anticipated prices—have fallen approximately 17.6% against the same strip priced as of the end of the third quarter of 2018:



26.    Commodity pricing pressures have resulted in materially reduced cash flow, while simultaneously decreasing the value of the Debtor's proven reserves.  For the Debtor, the dip in NGL prices has been especially dire:  realized NGL pricing for the San Juan and Wamsutter field has declined **approximately 70% from the third quarter of 2018**.  This collapse came just after the Debtor entered into a material midstream agreement with Wamsutter LLC ("***Williams***") (the L63 Agreement, as further described below) with substantial minimum volume commitments that are now unsustainable.  Estimating the amount of MVC deficiency payments

---

[8] Figures based on pricing data per IHS OPIS and the Debtor's lease operating statement provided by the Debtor's financial advisors.

requires a number of assumptions about uncertain future events. Under the forecasted production and usage of the gathering system,[9] based on currently producing wells, the Debtor estimates roughly that these onerous terms could require the Debtor to pay as much as $863 million of MVC deficiency payments over the life of the L63 Agreement alone.[10] One of the rationales of this Chapter 11 Case is to address the Debtor's escalating and unsustainable MVC obligations under certain midstream agreements.

27. In addition to general market pressures and significant MVC deficiency payments, the Debtor also faces other challenges including significant plugging and abandonment ("**P&A**") obligations, ongoing litigation and disputes with BP America Production Company ("**BP**"), underperforming wells, and other industry-specific challenges.

**B.    *The Williams Agreements***

28. The Debtor relies on third parties for the gathering and processing of produced gas and NGLs through a series of gathering agreements. Among these agreements are the Gas Gathering, Processing, Dehydrating and Treating Agreement, dated as of June 1, 2016, by and between Southland and Williams as amended from time to time (the "*L60 Agreement*") and the Gas Gathering, Processing, Dehydrating and Treating Agreement, dated as of November 1, 2018, by and between Southland and Williams (as amended from time to time, the "*L63 Agreement*") (collectively, the "*Williams Agreements*"). Additionally, given the current market environment and the Debtor's capital constraints, the Debtor has halted further drilling and completion

---

[9]These forecasts are based on proved developed producing reserves from the Debtor's internal projections, and excludes payments from FY 2019.

[10]This figure is an estimate, on a nominal basis, without discounting to present value, for illustrative purposes. It was developed based on a limited number of factors and multiple assumptions. A calculation of actual amounts owing would require a more detailed and fact-specific analysis. The figures presented with regard to the potential MVC deficiency payments are not intended as a final analysis and the Debtor reserves all of its rights and arguments in relation to the Williams Agreements. The figures presented with regard to the potential MVC deficiency payments are not intended as a final analysis.

activity, resulting in reduced volumes of product being gathered and transported under the Williams Agreements. Each of the Williams Agreements includes significant minimum volume commitments. Several wells in the Wamsutter field have underperformed over the past year, further exacerbating the MVC deficiencies under the Williams Agreements. As a result, the Debtor is now subject to significant and escalating MVC deficiency payments beginning with a payment of approximately $0.9 million under the L63 Agreement and a payment of approximately $3.1 million under the L60 Agreement, each of which became due on January 25, 2020.

29.    Although predicting future production is particularly difficult, based on estimates of the Debtor, the MVC deficiency payments for unused volumes over the course of 2020 alone are anticipated to be approximately $28 million absent any further drilling and completion activity. In 2023, annual MVC deficiency payments will more than double to approximately $72 million. Based on forecasts using current proved developed and producing reserves and assuming no further drilling and completion of proved reserves,[11] the total potential MVC deficiency payments due over the lifetime of the Williams Agreements could be as high as $895 million on an undiscounted basis.[12] As a remedy for non-payment, under its agreements, Williams is able to take gas-in-kind, eliminating significant cash flow. Williams also has contractual rights to suspend service, demand additional assurance, or in some cases terminate the contract if the Debtor is unable to perform.[13] The sheer magnitude of the Debtor's escalating

---

[11]These forecasts are based on proved developed and producing reserves from the Debtor's internal projections, and excludes payments from FY 2019.

[12]This figure is an estimate, on a nominal basis, without discounting to present value, for illustrative purposes. It was developed based on a limited number of factors and multiple assumptions. A calculation of actual amounts owing would require a more detailed and fact-specific analysis. The figures presented with regard to the potential MVC deficiency payments are not intended as a final analysis and the Debtor reserves all of its rights and arguments in relation to the Williams Agreements. The figures presented with regard to the potential MVC deficiency payments are not intended as a final analysis

[13]All such rights are now subject to the automatic stay.

MVC obligations, combined with Williams' remedies in the event of non-payment and the need to restructure the Credit Facility indebtedness, obliged the Debtor to develop and explore a chapter 11 strategy.

30.    On January 8, 2020, Williams took two actions that accelerated the Debtor's need to file for chapter 11 relief.  First, Williams sent the Debtor a demand for adequate assurance of payment under the Williams Agreements, requesting a cash payment of $6,901,007 within 48 hours.  Williams did not indicate a reasonable basis to demand assurance, as required by the Williams Agreements.  But in any case, the Debtor and Williams reached a short-term arrangement, and the Debtor agreed to make immediate payment, totaling approximately $1.7 million, to prevent Williams from exercising self-help remedies.  However, the approximately $4 million MVC payment remained due on January 25, 2020.

31.    Second, also on January 8, 2020, Williams filed a memorandum of the L63 Agreement in the real property records of Carbon and Sweetwater counties, Wyoming, in a late effort to perfect the dedication interest the Debtor granted in November 2018.  The Debtor disputes that it ever agreed to the form of memorandum Williams filed, and further reserves all related rights and claims, including those arising under sections 547(b) and 544(a)(3) of the Bankruptcy Code in respect of such recordation and purported dedication.

### C.    *Disputes with BP and Other Challenges*

32.    Pending litigation and ongoing disputes with BP have also negatively impacted the Debtor's business.  In litigation pending in Wyoming state court,[14] BP, as the lessee on mineral interests owned by Southland, seeks a declaratory judgment against the Debtor regarding BP's obligations to maintain production in paying quantities.  If Southland prevails in the BP

---

[14]*See BP America Production Company vs. Southland Royalty Company LLC*, Civil Action No. C-17-313-J, in the Third Judicial District Court in the State of Wyoming (the "***BP Litigation***").

Litigation, it would be vested with fee simple unencumbered title on at least 55 square-mile sections, which could then be re-leased or otherwise developed. The Debtor has obtained summary judgment on the key legal issue at the trial court, but corollary issues remain contested and an appeal may follow.

33.     The BP litigation limits the Debtor's ability to drill attractive locations and, subsequently, led to over-development of certain other sections in the Wamsutter. In addition, in early 2018, BP paused development of its Wamsutter interests, which negatively impacted the Debtor's projected non-operated production growth and cash flow due to reduced royalty interest payments. Moreover, BP's decision to downsize its operating team led to increased and unforeseen shut-ins of the Debtor's non-operating wells, further depressing production.

34.     In addition, certain underperforming wells have become or are projected to become uneconomic to operate due to the current market environment. Contractual and P&A requirements require the Debtor to implement certain plugging and abandonment procedures for any non-economic and shut-in well.

35.     Over the past year, the Debtor has also faced significant underperformance of wells relative to expectations, including several wells recently completed in late 2019. Early results from these wells from 2017 to 2018 were promising, and formed the basis for future estimated production. However, over the course of 2019 these wells faced multiple setbacks including increased variability in well results, declining oil and gas prices, a reduction to one operating rig, and a suspension of drilling operations in early December 2019. Accordingly, overall current production is approximately 79% of initial 2019 estimated production volume.

36.     The Debtor faced additional challenges. The shutdowns of the federal government in 2018 and 2019 caused extended delays in permitting, which in turn caused delays

in a number of operational activities, resulting in delayed and reduced production.  Abnormally harsh weather increased the cost and complexity of winter operations, negatively impacted operations and increased the frequency of well shut-ins.  Furthermore, higher water yields from Chain Lake wells resulted in additional costs and operating complexity, requiring additional capital spending on operated water infrastructure by the Debtor.  Each of these challenges stressed the Debtor's business.

###### D.    *Negotiations with the Lenders*

37.    As described above, on December 23, 2019, the Lenders redetermined the borrowing base under the Credit Facility to $400 million.  The Debtor had fully borrowed $540 million under the Credit Facility, resulting in an obligation to make borrowing base deficiency payments totaling $140 million over a 180-day period.

38.    Prior to, but in anticipation of, the borrowing base redetermination, and following the breach of certain covenants under the Credit Facility by the Debtor, the Agent and Lenders under the Credit Facility negotiated a forbearance agreement dated November 29, 2019. Pursuant to that agreement, the Agent and Lenders agreed to forbear from exercising remedies as a result of defaults arising from the Debtor's breach of certain covenants.  Upon the expiration of this initial forbearance agreement, the Debtor and Lenders entered into a second forbearance agreement on December 6, 2019.  Upon its expiration, and in light of the Debtor's inability to make the borrowing base deficiency payments, the Agent and Lenders entered into a third forbearance agreement, expiring on January 29, 2020 at 5:00 p.m. Central time (the foregoing forbearance agreements collectively, the "***Forbearance Agreements***").

39.    The Debtor used the breathing spell created by the Forbearance Agreements to assess its business plan, assets and liabilities, and how best to address the headwinds facing its business.  In addition to considering the options for satisfying its obligations under or refinancing

the Credit Facility, the Debtor evaluated its Williams Agreements, P&A obligations and projected revenue generation under multiple drilling scenarios. Given the magnitude of the Debtor's obligations relative to projected revenues, it became clear that there was no scenario where recapitalizing the Debtor's business would be feasible absent a restructuring of funded debt and other substantial obligations.

40.    On January 9, 2020, the Debtor met with Lenders to discuss in detail the Debtor's business plan and restructuring options and requested that Lenders work with the Debtor to develop a path forward. The Lenders indicated a willingness to provide debtor-in-possession financing (the "*DIP Financing*") and work with the Debtor to effectuate either an asset sale or a standalone restructuring. Given the Debtor's short liquidity runway and mounting MVC obligations, the parties worked expeditiously to negotiate DIP Financing, assemble marketing materials to initiate a sale process, and prepare for entry into chapter 11.

## IV.    The Debtor's Chapter 11 Case

### A.    *Dual Track Sale & Plan of Reorganization Process*

41.    The Debtor intends to work in consultation with the Lenders to explore sale and standalone reorganization alternatives. The Debtor intends to immediately commence a marketing process for its business to potential purchasers and evaluate bids for the Debtor. If the marketing process yields bids representing what the Debtor, in consultation with the Lenders, believes to be the highest available value to the Debtor's estate, either on a company-wide or asset-level basis, the Debtor may, in consultation with the Lenders, pursue a 363 sale transaction or transactions (the "*Sale Transaction*"), or incorporate such transactions into a plan of reorganization. In the alternative, the Debtor may determine, in consultation with the Lenders, to

pursue a standalone chapter 11 plan.   The marketing process will provide the Debtor with information necessary to determine the value-maximizing choice.

        **B.**     ***The Proposed Debtor-in-Possession and Exit Financing***

      42.     The Debtor enters chapter 11 with a cash balance of approximately $12 million. The Debtor requires additional financing to operate its business and conduct this case and, therefore, has secured debtor-in-possession financing (the "***DIP Facility***"), as further described in the motion to approve debtor-in-possession financing (the "***DIP Motion***") and its supporting declaration, filed concurrently with this First Day Declaration.   The DIP Facility matures six months after the Petition Date and provides for approximately $70 million in aggregate financing, which consists of a $35 million in new funding under a reserve-based revolving credit facility and a $35 million dollar-for-dollar roll-up of amounts outstanding under the Debtor's prepetition Credit Facility owing to lenders under the DIP Facility.   $10 million of the DIP Facility will be available to draw upon the Court's approval of an interim DIP financing order. The DIP Facility benefits from superpriority administrative expense claims and is secured (subject to customary permitted liens) by first-priority priming liens and security interests on all of the Debtor's property, now existing or hereinafter acquired, including, upon entry of a final order, the proceeds of avoidance actions, as specified in the DIP Facility credit agreement.

      43.     Initially, the DIP Facility will be provided by Citigroup Global Markets Inc. and/or certain of its affiliates and Barclays plc (the "***Backstop Parties***"), which have committed to provide the full amount of the DIP Facility.   On or prior to the date that is ten business days following the entry of the interim order approving the DIP Facility, each lender under the prepetition Credit Facility as of the Petition Date (each, an "***Eligible Lender***") will have the opportunity to subscribe for a *pro rata* percentage of the DIP commitments based on its amount

of loans outstanding under the prepetition Credit Facility on the Petition Date.  In the event that the DIP Facility is not fully subscribed by the Eligible Lenders, the remaining amounts will be allocated ratably among the Backstop Parties based on their underwriting percentages.

44.    The DIP Facility provides the Debtor with access to liquidity, allowing for the continued operation of the Debtor's business.  The new-money amounts borrowed under the DIP Facility will be used to fund the chapter 11 case and provide the Debtor with the requisite liquidity to satisfy its ongoing operational needs, such as payments to vendors and others, preventing any disruptions in the flow of production and sales that might otherwise result. Without the DIP Facility, the Debtor's estate would suffer substantial value degradation as a result of the Debtor's inability to continue ordinary-course operations, which would not only impact revenue generation, but could also cause the Debtor to lose valuable property and contractual rights, jeopardizing the Debtor's ability to effect a successful reorganization.

45.    On January 19, 2020, the DIP lenders provided the Debtor with a term sheet on the terms of the DIP Facility.  The Debtor marked the term sheet and negotiated better terms on a variety of issues.  Ultimately, the Debtor exchanged term sheets with the lenders numerous times before agreeing to the terms of the current DIP Facility.  The Debtor is not currently aware of any material unencumbered assets at the time of this filing.  In light of the recent borrowing base redetermination, and as there are no known unencumbered assets, the Debtor does not have the ability to prime the Credit Facility on a non-consensual basis.  As PJT Partners is testifying, no other capital is available on a junior basis.  I also believe that the Lenders are not willing to consensually allow priming from third-parties.

**V.      The Debtor's First Day Motions**

46.      Concurrently with the filing of this chapter 11 case, the Debtor filed the First Day Motions seeking relief related to the administration of this chapter 11 case, the Debtor's operations, and its cash and financing needs, to ensure its smooth entry into chapter 11.  I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion: (i) will enable the Debtor to operate in chapter 11 with minimal disruptions; (ii) is critical to the Debtor's restructuring efforts; and (iii) best serves the interests of the Debtor's estate and creditors.  Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above.  A list of the First Day Motions is set forth below.

47.      <u>Administrative and Operational First Day Motions:</u>

a)      *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay or Honor Prepetition and Postpetition (A) Obligations to Holders of Royalty Interests, Overriding Royalty Interests, and Working Interests; and (B) Production Expenses and Joint Interest Billings; and (II) Granting Related Relief*

b)      *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and (II) Granting Related Relief*

c)      *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain Its Insurance Policies, (II) Enter Into and Finance New Insurance Policies, (III) Maintain Its Surety Program and (IV) Pay All Obligations in Respect of the Foregoing*

d)      *Debtor's Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 Of The Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief*

e)       *Application of the Debtor for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Petition Date*

Cash and Financing First Day Motions

a)       *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to (A) Continue Its Existing Cash Management System and (B) Maintain Existing Bank Accounts, Check Stock and Business Forms*

b)       *Debtor's Motion for Entry of Interim and Final Order (I) Authorizing The Debtor to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition RBL Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief*

48.    The Debtor has narrowly tailored the First Day Motions to meet its goals of: (a) continuing its operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of its key customer constituencies during this chapter 11 case; and (c) establishing procedures for the efficient administration of this chapter 11 case.

49.    I have reviewed and discussed with counsel each of the First Day Motions (including the exhibits thereto), and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein.

50.    It is my belief that the relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtor's restructuring efforts and to maximize the recoveries for creditors.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs—those First Day Motions seeking relief related to the Debtor's obligations to its

21

owners of royalty and working interests, field service providers and related vendors, well operators, taxing authorities, banks, and insurers—the relief requested is essential to the Debtor's restructuring efforts and necessary to avoid immediate and irreparable harm to the Debtor's estate.   The success of the Debtor's chapter 11 case depends upon the Debtor's ability to maintain its operations and maximize estate value.   The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

51.     I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2020
      Wilmington, Delaware            * /s/ Frank A. Pometti*
                                        Name:  Frank A. Pometti
                                        Title:   Chief Restructuring Officer of the
                                                  Debtor